THE PEOPLE *v.* MIRÓ ET AL.

APPEAL from the District Court of Humacao.

*No. 592.—Decided June 21, 1911.*

COLLECTOR OF INTERNAL REVENUE—RESPONSIBILITY OF SURETIES—EXTINCTION OF BOND BY OPERATION OF CHANGES IN LAWS.—The sureties of a collector of internal revenue appointed May 1, 1900, and who signed the bond on May 14, 1900, are not responsible for a defalcation committed by said collector of internal revenue after the date on which the Political Code went into effect, because section 329 thereof, which is a substantial reenactment of section 38 of the Internal-Revenue Law of January 31, 1901, contained mandatory provisions creating new collection districts and new collectors with greater responsibilities, and even in case the same person continues to hold office, it is in reality a new appointment, which terminates the responsibility of the original sureties.

ID.—DE FACTO OFFICIALS—LACK OF PROOF OF NEW APPOINTMENT.—Even in case it has not been proved that a new appointment was made in favor of a collector of internal revenue after the Political Code became effective, and that he continued to hold office by virtue of an appointment made prior to the going into effect of said code, the presumption is that the Treasurer of Porto Rico has discharged the duty imposed upon him by section 329 of the Political Code by making a new appointment, and the party who desires to take advantage of the lack of said new appointment, to hold the sureties responsible, should prove those facts.

The facts are stated in the opinion.

*Mr. Jesús M. Rossy, fiscal,* for appellant.

*Mr. Luis Pereyó* for respondents.

MR. JUSTICE WOLF delivered the opinion of the court.

On May 1, 1900, Enrique Miró was appointed collector of internal revenue for the eighth district of Porto Rico, and was also designated and appointed disbursing agent to disburse money advanced to him for the salaries and expenses of his office and for the payment of the judicial salaries within the said district.

On May 14 the said Enrique Miró, as principal, and Jesús L. Pereyó and Marcelino Borges, as sureties, executed a bond to the Treasurer of Porto Rico in favor of The People of Porto Rico in the sum of $2,000. The condition of the bond was:

"If the said Enrique Miró shall truly and faithfully execute and discharge all the duties and trusts imposed upon him as such collector of internal revenues and disbursing agent, in accordance with law, and all orders, rules, and regulations made pursuant to law, and shall well and truly account for all revenues, fees, moneys, securities, and properties coming into his hand as such collector of internal revenues from and after May 1, 1900, and pay over all moneys so received and collected in full to the Treasurer of Porto Rico, and shall also well and truly account for all moneys coming into his hands as such disbursing agent from and after May 1, 1900, and pay over to the Treasurer of Porto Rico all unexpended balances thereof, then this obligation to be void, otherwise to be and remain in full force and virtue."

The present action was brought against both principal and sureties on June 28, 1906, and the complaint, after reciting the bond and its conditions, in its second paragraph sets forth that the said Enrique Miró—that is to say, the collector to whom the preceding obligation makes reference—between January 7, 1906, and June 13 of the same year 1906, while he was following such employment, received in his official character various sums of money amounting to $3,984.71, and, violating the duties of his confidential office, appro-

priated and converted to his particular use the said sum of $3,984.71 in the money of the United States. The prayer of the complaint prayed for the judgment against Enrique Miró and the sureties Pereyó and Borges. Judgment by default was obtained against the principal, Enrique Miró. The two defendants answered separately, admitting the execution of the bond and the defalcation, but denying all responsibility by reason of the changed conditions of the law and of the duties of a collector brought about by the enactment of the Political Code or such parts of it as are familiarly known as the Hollander bill.

The District Court of Humacao found in favor of the defendants substantially on the ground that the Political Code made such a change in the office and duties of a collector of internal revenue that the sureties on the bond given by such a collector could not be held responsible for an appropriation of money taking place after such laws went into effect. The court further held that as the Treasurer of Porto Rico was authorized and directed to create collection districts, not to exceed nine, to appoint collectors and to require them to execute a bond, the presumption arose that the Treasurer had fulfilled the duties so imposed and that the collector was necessarily acting under a new employment, and hence the sureties could not be made liable on their obligation. The defendants had also set up the fact that, relying on the change made by the Hollander bill, they thought themselves free from all responsibility and had disposed of the particular property which they swore they possessed at the time when the bond in question was executed.

The People of Porto Rico, through its attorneys, insists that while a bond must be most strictly construed, yet when a surety signs an official bond he must have in contemplation that the duties are liable to be changed by the legislature and that any changes in the law which do not materially affect the duties of the officer in whose behalf the surety binds himself cannot affect or destroy his obligation. (*People* v.

*Vilas,* 36 N. Y., 459; *Denio* v. *State,* 60 Wis., 949; *Spokane Company* v. *Allen et al.,* 37 Pac., 428.)

The situation will be rendered a little clearer by a consideration of the history of the Hollander bill and the condition of affairs at the time it was passed.  Section 3 of the Foraker Act provides as follows:

"That on and after the passage of this act all merchandise coming into the United States from Porto Rico and coming into Porto Rico from the United States shall be entered at the several ports of entry upon payment of fifteen per centum of the duties which are required to be levied, collected, and paid upon like articles of merchandise imported from foreign countries; and in addition thereto upon articles of merchandise of Porto Rican manufacture coming into the United States and withdrawn for consumption or sale upon payment of a tax equal to the internal-revenue tax imposed in the United States upon the like articles of merchandise of domestic manufacture; such tax to be paid by internal-revenue stamp or stamps to be purchased and provided by the Commissioner of Internal Revenue and to be procured from the collector of internal revenue at or most convenient to the port of entry of said merchandise in the United States, and to be affixed under such regulations as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, shall prescribe; and on all articles of merchandise of United States manufacture coming into Porto Rico in addition to the duty above provided upon payment of a tax equal in rate and amount to the internal-revenue tax imposed in Porto Rico upon the like articles of Porto Rican manufacture: *Provided,* That on and after the date when this act shall take effect, all merchandise and articles, except coffee not dutiable under the tariff laws of the United States, and all merchandise and articles entered into Porto Rico free of duty under orders heretofore made by the Secretary of War, shall be admitted into the several ports thereof, when imported from the United States, free of duty, all laws or parts of laws to the contrary notwithstanding; and whenever the Legislative Assembly of Porto Rico shall have enacted and put into operation a system of local taxation to meet the necessities of the Government of Porto Rico, by this act established, and shall by resolution duly passed so notify the President, he shall make proclamation thereof, and thereupon all tariff duties on merchandise and articles going into Porto Rico from the United States

or coming into the United States from Porto Rico shall cease,. and from and after such date all such merchandise and articles shall be entered at the several ports of entry free of duty; and in no event shall any duties be collected after the first day of March, nineteen hundred and two, on merchandise and articles going into Porto Rico from the United States or coming into the United States from Porto Rico.''

Subsequently, on January 31, 1901, the Legislature of Porto Rico passed an act which is entitled: ''An Act to provide revenues for The People of Porto Rico, and for other purposes.'' This act purported to be and was in fact the system of local taxation to which the Organic Act referred. The Legislature of Porto Rico, on July 4, 1901, passed a joint resolution notifying the President of the United States that the Legislative Assembly of Porto Rico had enacted and put into operation a system of local taxation to meet the necessities of the Government of Porto Rico, and asked that the President should make the proclamation to which the Foraker Act referred on July 25, the said date being a legally-established holiday in Porto Rico commemorating the anniversary of the coming of the American flag to the Island. Accordingly, on July 25, 1901, the President of the United States made proclamation that the Legislative Assembly of Porto Rico had enacted and put into operation a system of local taxation to meet the necessities of the Government of Porto Rico.

Section 38 of the said law of January 31, 1901,, provides as follows:

''For the collection of taxes imposed by this act, and for such other duties as may be prescribed, the Treasurer is. authorized and directed to create such number of collection districts, not to exceed nine in all, as may be necessary for said purposes; and to appoint, for each of said collection districts, one collector at an annual salary not exceeding eighteen hundred dollars, who shall give bond to the Treasurer, for the benefit of The People of Porto Rico, in such amount as the Treasurer may fix, said bonds to be approved, as to the form and execution, by the Auditor and, as to sufficiency of

surety, by the Treasurer: *Provided,* That said bonds shall be given to cover the liability of such collectors for all revenues and moneys collected and received and for moneys advanced to them from appropriations to pay the salaries and expenses of their respective offices: *And provided, further,* That from and after April 1, nineteen hundred and one, the salaries and expenses of the Insular courts outside of San Juan, which are now paid by the respective collectors of internal revenue, shall be paid by the disbursing officer of the Department of Justice, subject to the approval of the Attorney General. The Treasurer shall appoint such additional force of deputy collectors, not to exceed twenty-seven in all, as may be required for the proper execution of this act. Each deputy collector shall receive an annual salary not exceeding twelve hundred dollars, and shall enter into bond to the Treasurer in like manner as herein provided for the bonds of collectors.''

This section was substantially reenacted and made part of section 329 of the Political Code.

The words that the Treasurer is authorized and directed to create such number of collection districts, not to exceed nine in all, as may be necessary, and to appoint for each of such collection districts one collector at an annual salary not to exceed eighteen hundred dollars, are imperative. The local system of taxation being introduced and the Treasurer being directed to create collection districts, the only discretion he had was in the number of such collection districts, which was not to exceed nine, the number, as it happened, temporarily in existence. Even if the Treasurer chose to continue the same collection districts, in point of law he was creating the districts he chose to continue, and the officer that he selected for each of these districts was a new officer with a new term of office; and where a new term of office is created, the authorities are clear that the surety is not liable for a defalcation which occurred from the time of the new appointment. (*County of Wapello* v. *Bigham,* 74 Am. Dec., 370; *People* v. *Aikanhead et al.,* 5 Cal., 106; *Hubert* v. *Mendhain,* 64 Cal., 213; *Brown* v. *Lattimore,* 17 Cal., 93.)

This was the conclusion reached by the judge of the district court, and we are substantially in accord with the same.

It is urged by the Government that there was no proof that a new appointment was ever made. If such appointment was not in fact made and the officer was allowed to continue as a *de facto* officer under his old appointment, we think that the burden of proof was upon the Government to show this fact. The presumption was, as stated by the court below, that the Treasurer had complied with his duties and made a new appointment. If the fact were otherwise it should have been proved. However, whether this was shown or not, we think a new term of office was created naming a new officer with different duties and responsibilities, and he was to give a somewhat different kind of bond, as provided for by the section of the Hollander bill and the Political Code, to which we have referred.

We think, moreover, that the duties and responsibilities of a collector of internal revenue were materially altered by the law of January 31, 1901, and the ensuing proclamation of the President, contemplated by the Foraker Act. We have not been able to satisfy ourselves completely that a collector, Enrique Miró, for example, before the enactment of the law of January 31, 1901, had the same powers with respect to the attachment and sale of real estate as such a collector had thereafter. Some other minor changes were certainly caused by the act. There were changes in the schedule, and section 362 introduced some new matters of taxation. Section 346 of the Political Code provides that:

"If any collector, deputy collector, or agent shall, directly or indirectly, purchase any part of any real or personal property sold for the nonpayment of taxes, he and his sureties shall be liable on his official bond for all damages sustained by the owner of such property, and all such sales shall be void. In addition thereto, the officer so offending shall be deemed guilty of a misdemeanor, and shall, upon conviction thereof, be fined in a sum not exceeding one thousand dollars."

In addition to these minor changes the proclamation of the President caused to pass through the hands of the collector of internal revenues sums of money which had theretofore passed into the hands of the collectors of internal revenues of the United States. All wines, tobacco, playing cards, and many other objects coming from the United States into Porto Rico previous to January 25, 1901, had to pay a revenue tax to the Government of the United States which went through the hands of the National collectors. From and after the date of the proclamation these sums of money were collected by the internal-revenue collectors of Porto Rico, and their responsibilities materially changed. The duties of the principal being materially changed, under the authority of *People* v. *Vilas*, 36 N. Y., 459, *supra,* the sureties became released. We find no error in the judgment of the District Court of Humacao, and the same must be affirmed.

*Affirmed.*

Chief Justice Hernández and Justice Aldrey concurred. Justices MacLeary and del Toro dissented.